Alice GRAVER

v.

SECRETARY OF HEALTH, EDUCATION AND WELFARE of the United States of America.

Civ. A. No. 75–96.

United States District Court, E. D. Pennsylvania.

Nov. 24, 1975.

Ralph M. Bashore, Pottsville, Pa., for plaintiff.

Robert E. J. Curran, U. S. Atty., Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

This is a suit to review the final decision of the Secretary of Health, Education and Welfare who has denied the plaintiff's claim, as the widow of a miner, for "black lung" benefits pursuant to 30 U.S.C. § 902 *et seq.*, and regulations promulgated pursuant thereto. The Court has jurisdiction pursuant to § 205(g) of the Social Security Act, 42 U. S.C. § 405(g) as incorporated by reference through § 413(b) of the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. § 923(b).

Section 205(g) provides, *inter alia*, that:

"As part of his answer the Secretary shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based."

and that:

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the [case] for a rehearing."

It further provides that:

"The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * * *".

Cross-motions for summary judgment have been filed. We have reviewed the transcript consisting of 143 pages, including 62 pages of testimony taken on May 28, 1974, at which plaintiff was represented by able counsel.

Initially, the Administrative Law Judge devoted four pages of the transcript to introductory remarks attesting to an open and impartial hearing to the relaxation of the rules of evidence, including hearsay, and then proceeded to examine the plaintiff herself, suggesting that counsel would thereafter be given an opportunity to also question the plaintiff (p. 34). Such examination proceeded without substantial interruption until (p. 38) a question arose as to the meaning of the term "independent mining" which the judge interpreted as "self-employment". Efforts by counsel to explain were interrupted on two consecutive occasions (p. 39). Subsequent efforts to clarify the situation, either on or off the record, were denied (p. 43). Counsel was denied the right to explain "except through her (the plaintiff's) lips" (p. 44). Counsel's further efforts were repeatedly and consistently frustrated.

"MR. BASHORE: I may have to get some affidavits of people because I can't—I just want to point out independent mining simply means—(interrupted)

ADMINISTRATIVE LAW JUDGE: Oh, I know what it means, sir. I want to know what she means. He was self-employed she says.

MR. BASHORE: No, she does not mean—(interrupted)

ADMINISTRATIVE LAW JUDGE: That's what she says. Will you listen to me, then, counselor, please, I'll give you a chance to examine her thoroughly later as to what she means when she says he was self-employed. Right now she told me self-employed, I know what that means. All right, please.

MR. BASHORE: May I interrupt, your honor?

ADMINISTRATIVE LAW JUDGE: I don't want your opinion now, I want hers." (pp. 44 and 45)

The judge refused to look at certain records produced by counsel suggesting that they be submitted later (pp. 46 and 47). He incorrectly read those figures which he took the time to read.

"ADMINISTRATIVE LAW JUDGE: All right, it covers the year 1929. It says amount due $100.00, what does that $100 mean?

MRS. GRAVER: I think you'll find that that's one dollar dues." (p. 47)

He then criticized the evidence as having no probative value (p. 48). When the plaintiff produced certain additional papers, resulting from his questions, he refused to look at them but suggested that they be submitted to counsel and later submitted within "two weeks" (p. 49). He refused to entertain comments or questions by counsel, but ultimately asked the plaintiff, a widow and layman, or layperson, "Tell me why you feel that you are entitled to black lung benefits?" (p. 51) When she answered him, as best she could, he argued with her (p. 52). When finally, counsel was given the opportunity to examine, he was cautioned not to be "repetitive" of the already repetitious and sometimes irrelevant and argumentative examination by the law judge (p. 52). Counsel asked exactly three questions when he was interrupted by the judge and accused of leading the witness (p. 53). Those questions were preliminary in nature and hardly justified the immediate charge that the attorney was putting his "finger in her mouth" (p. 53). Counsel was then permitted to ask exactly 40 questions (pp. 53–58) when he was interrupted (p. 58). These interruptions continued, sometimes in an obvious and most conclusionary manner, as follows in connection with counsel's efforts to examine the plaintiff:

| Page | Interruptions |
|------|---------------|
| 58 | 3 |
| 59 | 4 |
| 60 | 3 |
| 61 | 4 |

In essence, counsel was forced to terminate his examination of the plaintiff and submit additional information within 30 days.

The hearing was then directed to the testimony of Dr. Dzurek. In doing nothing more than stating his background and qualifications, he was interrupted five times (pp. 61–63). Further interruptions continued as the doctor sought to express his views:

| Page | Interruptions and questions by judge | Questions by counsel |
|------|--------------------------------------|----------------------|
| 63 | 4 | 1 |
| 64 | 2 | 0 |
| 65 | 4 | 0 |
| 66 | 7 | 0 |
| 67 | 7 | 2 |
| 68 | 3 | 3 |
| 69 | 3 | 1 |
| 70 | 3 | 0 |

The record continues in like fashion.

Counsel was repeatedly denied the opportunity to complete a question. For example, on page 68 counsel spoke three times and was on each occasion interrupted as follows:

"MR. BASHORE: I want to make sure that he's given us his history, because I've asked permission to verify his work record. That he will—that I will—(interrupted)

\* \* \* \* \* \*

MR. BASHORE: The history is that he did work over 20 years as a deep miner and I don't—(interrupted)

\* \* \* \* \* \*

MR. BASHORE: I understand that, but that's the point—that is that I'm going to—(interrupted)."

The witness spoke not at all.

Although the rules of evidence were announced as relaxed (p. 31), counsel was severely admonished for asking plaintiff a leading question (p. 53). However, the judge did not hesitate to ask Dr. Dzurek most leading questions (p. 63 *et seq.*), some of which were long and cumbersome (p. 70). Argument with the witness continued at length (pp. 70–71).

Although counsel was repeatedly and continuously interrupted, cut short and admonished, he was ultimately accused of not bringing out relevant facts which, the record shows, he could not establish

because he was not allowed to present his case. Witness the following at page 72:

"ADMINISTRATIVE LAW JUDGE: Counselor, you didn't bring any of that out. The statements—the file will speak for itself. I will have to review everything very carefully in the file. But when you're giving a hypothetical to the claimant,—to the Doctor, you might as well give him everything, all the facts. You didn't mention that at all. All you said was based upon the affidavits of miners. I'm accepting based upon the statements and affidavits in the file, the history given in each of those documents, can the Doctor with any medical certainty say that this decedent had pneumoconiosis and the Doctor says Yes, without clinical examination and without x-rays and pulmonary functions tests. I have no further questions to ask of the Doctor.

MR. BASHORE: I only want to point out that I didn't understand that I had to—when I said to him have you read the statements that are in the record.

ADMINISTRATIVE LAW JUDGE: He said Yes.

MR. BASHORE: Yes. But—then I—but after—

ADMINISTRATIVE LAW JUDGE: Then you started enumerating certain items but you didn't enumerate what you're just telling me now.

MR. BASHORE: Well, they're in the statements."

The "argument" with Dr. Dzurek continued (pp. 74–76). At pages 74, 75 and 76, for example, counsel asked absolutely no questions of the witness. When finally counsel was permitted to finish a question to Dr. Dzurek (p. 78), the answer resulted in the following "argument" with the judge:

"DR. DZUREK: In my opinion it did.

ADMINISTRATIVE LAW JUDGE: Clarify it please.

MR. BASHORE: I'm sorry.

ADMINISTRATIVE LAW JUDGE: I want the doctor to give me why. I want the reasons for his opinion, not just a cold opinion. I want his rationale.

DR. DZUREK: The reason I'm saying so because as I—the witness, particularly Mrs. Graver, and in a long discussion about that her husband many times expressed the opinion that he can't go on any further.

ADMINISTRATIVE LAW JUDGE: Not many times. He said it just once.

DR. DZUREK: No, no, now.

ADMINISTRATIVE LAW JUDGE: That's the facts that we have

DR. DZUREK: Many—(interrupted)

ADMINISTRATIVE LAW JUDGE: Let's base your opinion on the facts in the case.

DR. DZUREK: On her statement—

ADMINISTRATIVE LAW JUDGE: Go ahead.

DR. DZUREK: Many many times expressed opinion honey, if I may use that term—

ADMINISTRATIVE LAW JUDGE: Doctor you're putting words into the record which—(two voices heard here) Doctor, you are not being responsive. You're adding words which were never in the testimony. In your opinion—are you a psychiatrist?"

(p. 79)

That Dr. Dzurek had psychiatric training (p. 80) somehow led to an interest in plaintiff's and decedent's social activities and pages of examinations, sometimes argumentative, by the law judge (pp. 84–91). From page 84 to page 89, counsel was afforded no opportunity to speak. When at last he spoke, this is what happened:

"MR. BASHORE: I think that—(interrupted)

ADMINISTRATIVE LAW JUDGE: I know the examination to the proof of your case but I try to be as thorough and as complete as I can and no sense in being repetitive. If you can bring out something new, fine. This way this can go on all day.

MR. BASHORE: It'll be just a couple of questions. I only want to ask her what the size of the town is where her mother lived; where her other relatives led. This community is a very small town.

ADMINISTRATIVE LAW JUDGE: She said they visited the relatives together. Does that change the situation?

MR. BASHORE: Yes, it does because they were in the same community and town, lived in the same community.

ADMINISTRATIVE LAW JUDGE: But they did go to visit relatives together.

MR. BASHORE: Certainly, certainly; that was prior to the last two years.

ADMINISTRATIVE LAW JUDGE: And in the last two years.

MRS. GRAVER: No, I said we didn't —he didn't go out visiting much in the last two years. I said maybe at Christmas time to his brother's.

ADMINISTRATIVE LAW JUDGE: To his brother's or your mother?

MRS. GRAVER: Yes, more to my mother.

ADMINISTRATIVE LAW JUDGE: Did he have many friends?

MRS. GRAVER: Yes, I'd say he had friends.

ADMINISTRATIVE LAW JUDGE: Did the friends come around to the house?

MRS. GRAVER: In the summer time the ones that lived around him came but towards the last—(Interrupted)

ADMINISTRATIVE LAW JUDGE: I'm talking now about the last two years because you made a point of saying the last two years he'd changed. I want to know where the change is in the last two years?

MRS. GRAVER: I think in not socializing with people and not going out when he came home from work (interrupted)

ADMINISTRATIVE LAW JUDGE: You didn't have much of a social work before that, that's the point.

MRS. GRAVER: Well, like I say maybe some people don't really have to have a social life but I think he really changed.

ADMINISTRATIVE LAW JUDGE: And I'm trying to find out from you how he changed. In what manner?

MRS. GRAVER: Well, we had—we always planted a garden and things like that which he could not do—he did not and could not do it and he used to sit out under the tree and neighbors would come and they would sit with him but to the end there was none of that any more. Just—he just seemed to want to be just by himself.

ADMINISTRATIVE LAW JUDGE: All right. You submit a memorandum to me counselor, together with everything else that you have to do and then we'll see where we'll go from there.

MR. BASHORE: If I find that I run into difficulty—(interrupted)

ADMINISTRATIVE LAW JUDGE: If you need additional time, you'll contact me.

MR. BASHORE: And do I do that by letter?

ADMINISTRATIVE LAW JUDGE: You can do it by letter or by phone, you have your choice.

MR. BASHORE: Okay.

DR. DZUREK: Thank you, your Honor.

ADMINISTRATIVE LAW JUDGE: Thank you all.

(The hearing closed at 3:00 p. m., on May 28, 1974.)

(pp. 89, 90 and 91)

Thus, in fact, plaintiff's counsel asked no further questions of the witness because of argumentative interruptions.

The hearing lasted one and one-half hours, most of which was consumed by the judge and little opportunity was afforded counsel to try his case. Any resulting deficiencies in the case counsel was obliged to supply, within 30 days, forwarding same to San Jose, California.

That the law judge has "other cases" (p. 84) and that "we have to dispose of these cases", (p. 77) does not justify encroachment upon the plaintiff's statutory and constitutional rights to a full, fair, complete and impartial hearing. This Court is also subjected to the constant and burdensome administrative and statistical pressures to "dispose of these cases" (p. 77) and we too have "other cases" (p. 84.) While the computer can add and subtract numbers faster and more accurately than the human mind and thus keep the "pressures" applied, it cannot weigh the quality of justice dispensed under the "pressures" it creates. The measure of quality goes unstatisticized and unrecorded. But when all cases are up to date and all calendars current, we will have gained nothing if justice has not been dispensed and public confidence in our judicial system destroyed. It will then be too late to revise the process from *within* the system because those who reacted to and satisfied the demands of the computer are collectively "the system" and will ill-explain the sacrifice of quality. They will find no refuge in the computer and receive no defense from the administrators dispensing the statistics. This record aptly demonstrates what happens when a judicial officer understandably and conscientiously reacts to unrelenting statistical pressures. However, neither this plaintiff nor any other like litigant will understand the sacrifice of his case to the computer, but he will long remember. Neither will he be a defender of the system nor will he recognize it as the best system which man has thus far devised. Reform may be

sought, but it most likely will not be sought from within the system, but from the outside.

For more than thirty years our society has been on a "speed" binge, on the production lines, in the air and on the highways, building super highways, criss-crossing the nation to accommodate greater speeds. Only recently, by reason of circumstances beyond our control, has the fuel crisis produced statistics showing that reduced speeds produce fewer accidents no matter how safety-oriented may be the highway involved. However, the "accident" rate of speedy "justice" cannot be measured. Justice and the quality thereof is an evasive product of the human mind incapable of measurement by computers and, therefore, incapable of statistical results. When the lack of quality and its unmeasured results are sufficiently felt by a society which increasingly relies upon its judiciary, it may be too late to correct from *within* the system. Too many precedents may have been established, too many litigants hurt and too much confidence lost by too many to justify the reform of the then-existing system. This could be especially true if at that time in history a "saviour" beckons and from his lofty dais promises a cure. Within the recollection of those who still live, there is history for this morbid suggestion among peoples no less intelligent and no less gullible than we.

To suggest that justice delayed is justice denied is not the answer. Justice delayed is not *always* justice denied, and speedy justice is not *always* justice obtained. Increased pressures on the judiciary resulting from increased litigation because of increased use of the courts by our society is an increased burden which must be met by the judiciary alone, without sacrificing the quality of the justice dispensed. The resulting pressures should and must be assumed by the judiciary without complaint. However, the additional and sometimes unwarranted pressures emanating from legislative and administrative forces in the form of faceless statistics spewed

out by soulless computers may constitute an unjustifiable burden which the judiciary is not warranted in assuming, tending as it sometimes must to adversely affect the quality of justice. If justice delayed is justice denied, then justice without quality is also justice denied, a result for which the judiciary alone will be held accountable without reference to collateral pressures from whatever source.

We shall remand the record for further proceedings to afford to the plaintiff a full and complete hearing.